**LITTLE ROCK SCHOOL DISTRICT, Plaintiff,**

v.

**PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1; North Little Rock School District; Arkansas State Board of Education; Wayne Hartsfield; Walter Turnbow; Harry A. Haines; Jim Dupree; Dr. Harry P. McDonald; Robert L. Newton; Alice L. Preston; Jeff Starling; Earle Love; Bob Lyon; John Ward; Judy Wear; Leon Barnes; Marianna Gosser; Steve Morley; Mac Faulkner; Bob Moore; Don Hindman; Shirley Lowery; Sheryl Dunn; David Sain; Bob Stender; Grainger Williams; Richard A. Giddings; George A. McCrary; Buddy Raines; and Dale Ward, Defendants,**

**Katherine Knight, Individually and as President of The Little Rock Classroom Teachers Association (LRCTA); LRCA; Ed Bullington, Individually and as President of The Pulaski Association of Classroom Teachers (PACT); PACT; John Harrison, Individually and as President of The North Little Rock Classroom Teachers Association (NLRCTA); NLRCTA; and Milton Jackson, Individually and as a Non-Certified Educational Support Employee of the Little Rock School District, Lorene Joshua, as next friend of minors Leslie Joshua, Stacy Joshua and Wayne Joshua; Rev. Robert Willingham; Sara Matthews as next friend of Khayyam Davis, Alexa Armstrong and Karlos Armstrong; Mrs. Alvin Hudson as next friend of Tatia Hudson; Mrs. Hilton Taylor as next friend of Parsha Taylor, Hilton Taylor, Jr. and Brian Taylor; Rev. John M. Miles as next friend of Janice Miles and Dereck Miles; Rev. Robert Willingham on behalf of and as President of the Little Rock Branch of the NAACP; Lorene Joshua on Behalf of and as President of the North Little Rock Branch of**

NAACP, Becky McKinney, Mary J. Gage, Janice Dent and Joyce Person, Intervenors.

No. LR–C–82–866.

United States District Court, E.D. Arkansas, W.D.

May 13, 1987.

See also 660 F.Supp. 624.

P.A. Hollingsworth, Philip E. Kaplan, Janet L. Pulliam, John M. Bilheimer, Little Rock, Ark., for plaintiff.

Wright, Lindsey & Jennings, Little Rock, Ark., Neal, Gerber & Eisenberg, Chicago, Ill., C.R. McNair, III, Asst. Atty. Gen., Little Rock, Ark., Sharon Streett, Dept. of Educ., Little Rock, Ark., Jack, Lyon & Jones, Little Rock, Ark., Stephen L. Curry, Little Rock, Ark., for defendants.

Theodore Shaw, New York City, John W. Walker, Little Rock, for intervenors Joshua, et al.

Richard Roachell, Cearley, Mitchell & Roachell, Little Rock, Ark., for intervenors Knight, et al.

Robert D. Cabe, Cabe & Lester, Little Rock, Ark., for intervenors McKinney, et al.

## ORDER

HENRY WOODS, District Judge.

### I.

### INTRODUCTION

This order deals only with teacher reassignments in the Little Rock School District (LRSD). The Little Rock School District Plan approved by this Court on February

27, 1987, noted that 40% of the staff of the LRSD was black. (LRSD Plan p. 16). The Plan had a goal of 50% black staff within the next five years.

Considering the progress made toward staff integration in the last few years, the 50% goal seemed obtainable and teacher reassignments constituted the least of my concerns in the enforcement of the Eighth Circuit Mandate. I had assumed the establishment of the magnet schools and student assignments would present formidable challenges. Unfortunately, teacher reassignment has evolved into a major issue.

On April 10, 1987, approximately one-half of the LRSD teachers were reassigned. (Depending on the calculations used, between 42.9% and 51.31% of the teachers were reassigned.) Reassigning this many teachers appeared to violate both the Plan and Orders of this Court. I stopped further implementation of the Plan, and shortly thereafter the LRSD Board adopted a new position concerning teacher reassignment. Before setting out the measures determined to be necessary to implement the Plan and achieve the goals of this litigation, some background details are provided.

## II.

### THE RELATIONSHIP OF TEACHER ASSIGNMENTS TO THE CONTROLLED CHOICE PLAN

■ The LRSD Plan had as its centerpiece a "controlled choice plan." This appeared to the Court to be a very attractive feature. It was described in the LRSD Plan as follows:

> The controlled choice assignment policy is designed to provide maximum choice for parents in selecting the schools their children will attend within the constraints imposed by available space, the requirements of racial desegregation, and the special programmatic needs of the children.

(LRSD Plan p. 13). The LRSD Plan provided that students would be initially assigned to a school and that they would have a period of 30 days to accept that choice or submit three other ranked choices and/or a magnet school choice which the LRSD would attempt to accommodate. During the thirty-day period, parents were encouraged to visit the schools and were advised they could interview staff before making their choice.

The LRSD distributed student assignment forms to students on March 18, 1987 (one day before school ended for spring vacation) with a deadline to return the forms by April 1, 1987 (exactly two weeks later), and on March 18, teachers had not yet been assigned for the 1986–87 school year. Because the schools were closed for Spring vacation from March 20–30, 1987, parents and students could not visit the schools until March 30, 1987, when LRSD held the first of two days of "open houses" at the schools. Because teacher assignments had not been made, only the outgoing and newly assigned principals could be present to meet visiting parents and students to discuss plans for the next school year. At that time, curriculum plans for magnet and specialty schools were incomplete. On March 19, 1987, LRSD voluntarily extended the deadline for returning the student assignment forms for five days from April 1 until April 6, 1987. It was clear at the time, however, that staff assignments would not be completed by that date.

These developments concerned me since it appeared that LRSD was deviating significantly from its own Plan by cutting the selection time in half, and by failing to assign staff to the schools. If "controlled choice" is to work, parents must be given the opportunity to visit with staff as promised.

In a Letter/Order filed on March 20, 1987, I directed LRSD to make as little change as possible in the present staffing and to adhere to the Plan's controlled choice student assignment policy. The deadline for parents to turn in the student assignment forms was extended until April 20, 1987, one month from the date of the Order.

In response to my Letter/Order of March 20, 1987, LRSD's attorneys request-

ed a conference, which was held on March 27, 1987. On March 25, 1987, two days before the conference, Mr. P.A. Hollingsworth, one of the attorneys representing LRSD, wrote a letter to me addressing the concerns I had expressed in my Letter/Order. After addressing my concerns generally, Mr. Hollingsworth admitted that LRSD had deviated from the Plan's operating procedures for student assignments by changing the time for making choices from 30 days to 18 days:

> We apologize for changing the time for making choices from 30 days to 18 days. Although there is an explanation for the change, in retrospect, it would have been appropriate to have contacted the Court with the explanation prior to making the change.

At the hearing held March 27, 1987, one of the attorneys representing LRSD stated that "[t]here was never an intention to disperse 80 percent of the faculty." (Tr. p. 7). Mr. Kaplan, one of LRSD's attorneys, also conceded that LRSD had erred in not seeking my permission to deviate from the Plan's operating procedure for student assignments. It was apparent that LRSD did not appreciate the significance of its Plan's requirement that staff assignments be made prior to the distribution of student assignments. By making student assignments first, LRSD thwarted the Plan's "controlled choice" student assignment policy, a policy which I viewed as "the attractive part of the Plan." (Tr. p. 7).

In its response to the First Report of the Citizens' Committee, LRSD contends (for the first time) that the Plan did not require that staff be in place for the 1987–88 school year:

> The plan states that parents will have access to the principals and teaching staffs of schools when they visit schools to make their choices. Plan, p. 12. It is easy to understand that a reader would expect the staff to be in place when that occurs. However, the LRSD has never anticipated that the factor of faculty identity would have a great deal of meaning for the exercise of choices in the first

year of implementation, but only in subsequent years."

I find that assertion not only surprising but alarming. To think that the LRSD would believe the Court would assume that it had no intention of complying with the admitted clear meaning of its Plan is appalling. Further, to blame the Court for creating "time pressures" by insisting that LRSD do what it promised is unworthy. Any time pressure problem in teacher assignments rests squarely with the LRSD. The LRSD has known since November, 1986 that its district would include fourteen new schools next year. Yet it was apparently not until after the March 27 conference that LRSD began interviewing current PCSSD teachers.

As justification for a massive teacher reassignment, the LRSD has advanced two major premises: (1) it was made necessary by an agreement with the Classroom Teachers Association and (2) it was implied by the use of the terms "equity" and "desegregation" in the LRSD Plan itself.

### III.

### THE AGREEMENT BETWEEN THE CLASSROOM TEACHERS ASSOCIATION AND LRSD

Undoubtedly a major factor in the massive teacher reassignment was an agreement entered into between LRSD and the Classroom Teachers Association (CTA) according to which teacher reassignments were to be made (Reassignment Policy). This agreement for some completely inexplicable reason was never brought to my attention by the LRSD, CTA or any other party to this case, even though it was submitted by the CTA to LRSD on February 25, 1987 and approved by the LRSD Board on March 5, 1987. My first notice of this agreement was its attachment as an exhibit to the motion filed on April 22, 1987 by LRSD asking me to recuse. The Reassignment Policy is attached as Exhibit A to this Order. The only agreement between LRSD and CTA in the record prior to April 22, 1987 was the Professional Negotiations Agreement (PNA) which was made an ex-

hibit by the Knight Intervenors in February of 1987.

Article XXXVIII of PNA is applicable when the LRSD is reorganized; it contains only the criteria of "seniority" and "area of certification." It does not include race, which is what the litigation is all about. Race is the "balance" with which I was concerned when I approved the LRSD plan. I now find that LRSD entered into a agreement with the CTA outside the Plan and this litigation in which teachers were assigned on the basis of a model constructed from the demographic composition of the present teacher makeup of LRSD before reorganization. Race is only one of the factors in the model. The others are sex, age, education and experience. There is absolutely no evidence in this record to indicate that the present teacher makeup of the LRSD is a proper model for "balance" in the district. In fact, Dr. Willie testified in the April 29 hearing that LRSD was not a proper model for gender. (TR. 232). Never did I approve such a model. Even if the issue had been presented to me, there was nothing in the record on which to base such approval.

There is another flaw in the LRSD–CTA model. While I do not claim to be a mathematician, I know that the more factors introduced into a model, the more dilution occurs with respect to other factors. While sex, age, education and experience may be desirable facts to consider in hiring or reassigning teachers, there is nothing in the record of this litigation to show that LRSD's current assignments are deficient in these areas. There is nothing in the record concerning complaints against the district in these areas or deficiencies with respect thereto. There are, however, reams of testimony and exhibits concerning deficiencies as to racial makeup of teacher staffing in LRSD. That is what the litigation is about. That is the issue to which all the testimony in this case has been directed. For LRSD to inject four other factors, without any evidence and without my knowledge or approval, as a basis for massive teacher reassignments is indefensible. These criteria are not mentioned in any of my orders or the order of the Court of Appeals. I am not convinced that application of this so-called "model" will aid racial desegregation. I am convinced that it will hamper racial desegregation.

The Court is deeply concerned about another aspect of the LRSD–CTA agreement. LRSD and CTA agreed to keep principals from having any role in the selection of their staffs. This decision contradicts the Plan's emphasis on school-based management and past practices in LRSD. Neither teacher evaluations nor other "subjective" measures of competency were used in the staff assignment process. CTA members monitored the reassignment process. Appeals of reassignments under the Reassignment Policy were to be decided by a committee consisting of three representatives of the CTA and three LRSD administrators.

LRSD based reassignments on a "core" staff of teachers "who will remain at the school to which they are presently assigned. The core staff will not exceed 20 percent of the teaching positions in any school and will be required to meet the balance criteria as will all assignments." (Reassignment Policy, IV). All teachers were sorted by the various "balance" criteria. Of teachers currently staffing a particular school, 20 percent were retained by seniority so long as the Reassignment Policy's "balance" criteria were met. Having retained the "core" staff for the next school year, the remaining vacancies in each building were filled through application of the Reassignment Policy's criteria.

## IV.

### THE "EQUITY" JUSTIFICATION FOR THE MASSIVE REASSIGNMENTS

■ The LRSD argues that the use of the word "equity" in the LRSD plan on several occasions explicitly means "balance" in race, sex, age, education and experience. LRSD argues that the word "equity" should be thus defined without further elaboration. Consultation with all the standard and legal dictionaries has failed to disclose any support for affording the single word "equity" such a vast panorama of

concepts. Dr. Willie, however, testified as follows:

A  I was an advisor to the—central administration.

Q  From its very beginning?

A  From the beginning.

Q  Sir, we have come up with specific factors other than race that we've been talking about all day. It seemed to be important, and we called them in a group "equity considerations;" is that right?

A  That's correct.

Q  If they were so important, why didn't you advise Mr. Kelly and the Board to list them specifically in that plan?

A  Well, they were listed in a way that intelligent people would understand them on page 18.

MR. TRICE: Thank you, sir.

THE WITNESS: Page 118. 118.

(Tr. pp. 254–55).

Page 118 is the first page of the summary of the LRSD Plan. Part (A) under the summary deals with Racial Equity, (B) with Educational Equity and (C) with Organizational Equity. I have read page 118 carefully. The word "equity" is used in one sentence on page 118, which reads as follows:

Administrative, certificated, and all other personnel must be fully deployed desegregatively across all locations and organized in ways that will facilitate both the racial and educational equity aims basic to District's reorganization plan.

The terms "racial balance" and "racial composition" are each used twice. In fact, page 118 deals entirely with racial balance. The next page, which is under the subheading "Racial Equity," deals with transportation, hiring practices and linkage with institutes of higher learning. At no place on page 118 or under this subhead is there any mention of equity in relation to sex, age, education and experience. The only time "equity" is mentioned specifically is in reference to "racial" and "educational" equity.

The meaning of "Educational Equity," the title of subhead (B) beginning on page 120, is explained in great detail. The subsection deals with grade structure, course offering, special services, gifted and talented programs, curriculum, day care, promotions and co-curricula activities. The subhead is summarized in a single paragraph on page 123 as follows:

Equity in educational outcomes in essence means that students are assured they are able to aspire to every adult role in the community; teachers are dedicated to the principle of integrated education; every child in the school is given access to a full measure of the instructional resources of the school; racial fairness fully obtains in grading and discipline; and students are guaranteed the right to an education in an atmosphere free of racial discrimination.

■ Subheading (C) entitled "Organizational Equity" deals with boundary adjustments, election of Board members, school-based management (which is endorsed), PTA, and biracial committees. Subheadings (D) and (E) deal with "Facilities" and "Finance." At no place in the subheadings is "equity" used in the sense being advanced by LRSD. "Equity" is simply not a synonym for desegregation, as Dr. Kelly seems to state:

Q  When you answered today, as you have been answering questions about desegregating staff, when you used that term today in this courtroom—

A  Okay.

Q  —are you just talking about race, or are you talking about all these criteria?

A  We talked today about desegregating the staff. We were talking about having on the black-white and the other characteristics also to achieve equity.

(Tr. 212).

Subheads (A), (B) and (C) are a fair summary of the LRSD Plan, which is organized on this same structure. Part II deals with Racial Equity, Part III with Educational Equity and Part IV with Organizational Equity. Part V deals with Facilities and VI with Finances. If the Plan intended to address equity in gender, age, education and experience, why did not these subjects

at least merit one of the 36 subheads of the Plan as noted in the table of contents? I have searched the Plan carefully and do not find one word or sentence which implies that equity is being used in this plan in the sense claimed by Dr. Kelly and Dr. Willie. This argument is clearly make-weight to buttress the unfortunate agreement between LRSD and CTA.

Significantly, under the Staff Assignment section of LRSD Plan, the only two policy guidelines mentioned are the district-wide 50% black-white requirement plus a one-fourth deviation by building permitted by the Eighth Circuit. The LRSD has five years to achieve these goals. In view of the extensive desegregation in the teaching staffs, these goals should not be difficult to reach. At page 16 the LRSD Plan states:

> Since the District now has a black certified staff of about 40 percent, a one-half black staff can be attained over a period of five years without terminating or dislocating current staff.

## V.

### THE NEW POLICY OF THE LRSD BOARD

LRSD went forward with making the massive teacher reassignments made on April 10, 1987. On April 15, I issued an order for the LRSD to show cause for noncompliance with my Order directing the LRSD "to make as little change as possible in the present staffing" of its schools. Before this hearing, it was obvious that the LRSD Board had retreated from its massive reassignment plan. It adopted a new policy of retaining 80% of the staff of each school instead of the 20% core mandated by the agreement with the CTA. It is my belief, based on the new policy, that the Board has reached a position very close to the remedial measure ordered by me, *infra*. After hearing Dr. Kelly's testimony on April 29, I am convinced that the board will support these measures. I am not yet convinced that the LRSD administration is so committed. I am sure that upon reflection, each member of the administration will realize it is his/her duty to carry out the decisions of the Board, which is the policy-making body of the LRSD. Because the Board has reversed an unwise and recalcitrant policy, I will make every effort to work with it to establish stability in the LRSD. I am convinced it can be done. However, to ensure that there is no further misunderstanding of this teacher assignment order, LRSD is to have in my hands by May 18, 1987, the name and race of every senior high and junior high teacher reassigned from his/her present school, the school to which the teacher is assigned and the reason for the reassignment. By May 26, I expect to receive similar information about elementary school teachers and by June 1, 1987, to have the information about Pulaski County teachers.

## VI.

### THE PROVISION FOR ARBITRATION OF THE SENIORITY DISPUTE

LRSD, Little Rock Classroom Teachers Association (LRCTA) and Pulaski Association of Classroom Teachers (PACT) entered into an agreement to arbitrate the question of the seniority to be awarded to teachers from the Pulaski County Special School District who will be employed by LRSD for the 1987–88 school year. (Court's Ex 1 at 4–29–87 hearing). The parties could not agree as to how the issue would be framed, which is somewhat unusual in an arbitration case. The arbitration agreement is unusual in another aspect. The agreement asks the arbitrator to decide an issue which is not addressed by any collective bargaining agreement between the LRSD and the LRCTA. Without my prior approval, the agreement transfers to an arbitrator an issue which is clearly embraced within the mandate of the Court of Appeals. In implementing the remedy mandated by the Court of Appeals in *Little Rock School District v. Pulaski County Special School District*, 778 F.2d 404 (8th Cir.1985), this Court has the equitable power to limit the adverse impact that the remedy may have upon third parties. *See Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); and *Lemon v.*

*Kurtzman,* 411 U.S. 192, 200–01, 93 S.Ct. 1463, 1469–70, 36 L.Ed.2d 151 (1973). This authority includes the adjustment of certain employment, promotion, or seniority rights of teachers displaced by the court ordered annexation of portions of the Pulaski County Special School District by the LRSD. *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211, 1218 (5th Cir.1969) (en banc) rev'd in part on other grounds, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530, *cert. denied,* 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530, opinion on remand, 425 F.2d 1211 (5th Cir.1970). *See also, Cousin v. Board of Trustees of Houston Municipal Separate School,* 726 F.2d 262, 265–66 (5th Cir.1984); and *Lujan v. Franklin County Board of Education,* 766 F.2d 917, 924 (6th Cir.1985).

## VII.

### THE REQUIRED REMEDIAL MEASURES

#### A. *Teacher Reassignment in the Junior and Senior High Schools in the Original LRSD*

Eighty percent of the staff will be retained at all junior and senior high schools within the original Little Rock School District with the exceptions of Parkview and Mann, which are both becoming magnet schools. Since staff will have to be "recaptured" to bring Dunbar and Henderson back to the 80% level, recapture shall be first instituted on the basis of the least amount of seniority. At Forest Heights and Southwest, transfers shall be allowed on seniority only to the level where 80% of the staff can be maintained. Since Parkview and Mann are magnet schools, the staff shall be recruited and employed by LRSD with the assistance of the principal in consultation with the Magnet Review Committee (MRC) as discussed below.

#### B. *Teacher Reassignment at the Primary and Intermediate Schools*

Because of the necessity to convert primary and intermediate schools to K–6, more than 20% of the teachers will have to be transferred or primary teachers will have to teach at intermediate levels and vice versa. In these schools (K–6, I–3 and 4–6), all voluntary transfers shall be honored. "Voluntary transfer" refers to a first choice request by a teacher. Teachers who wish to be transferred rather than teach at another level will be allowed to request transfers. The balance of the staff will be first employed from teachers reduced in force by the PCSSD and then from new staff applicants.

#### C. *The Annexed Schools*

All present PCSSD teachers who have been offered employment by the LRSD will be assigned to their present school, with the exception of J.A. Fair which is being reorganized as a senior high school. There, eighty percent of the existing high school faculty shall be retained and junior high school faculty shall be transferred to other junior high schools. If the reassignment produces a retention rate greater than 80%, some staff will be eligible for involuntary transfer on a seniority basis. Vacancies at all levels will be filled first from the balance of Pulaski County Special School District (PCSSD) staff that was reduced in force, secondly by transfer from the Little Rock schools and finally from new employees. As to the PCSSD staff reduced in force who applied, but were not offered employment by LRSD, the Court directs LRSD to review those applicants to determine whether their rejection was based on the applicant possessing characteristics regarding age, sex, race, education or experience that caused an "imbalance" under the Reassignment Policy. The Court expects LRSD to employ the most qualified applicants without regard to the so-called balance criteria of the Reassignment Policy.

#### D. *The Magnet Schools*

Teacher assignments to the magnet schools shall be based on the desire of the individuals to teach in that magnet school, along with competency in subject matter. Transfers shall be freely granted from other schools to accommodate such a teaching motivation. Staffing of the magnets shall be made in close consultation with the prin-

cipal and the MRC. Any teacher presently assigned to a past or future magnet school who is competent and who desires to remain shall be retained. The MRC shall be consulted concerning the staffing of all of the magnet schools. This means that LRSD is directed to provide the MRC with the same information it is giving the Court as to the staffing of the magnet schools on May 26, 1987. The MRC is directed to provide any comments it has on the proposed staffing to LRSD and the Court by May 29. The Court of Appeals decision states that these schools shall be "administered" by the MRC. The Court considers that staff is an important aspect of "administration."

As much as possible these schools shall be extraordinary schools and they *shall* be staffed by teachers who have extraordinary proficiency in the theme of the magnet school. I believe that such teachers are available within the LRSD and the PCSSD, but if not, they shall be hired from any available source. It is necessary that these schools succeed. They will only succeed if they offer something extra in the theme area. Parents must believe that their children are going to receive something extra in this school or the magnet schools will not be supported. The idea that the magnet is just another school to be staffed like every other school within the LRSD is a prescription for failure.

At the hearing on magnets, which I have set for May 20, 1987, this matter will be explored in depth as will selection of the magnet principals. At that time the Court's own expert on magnet schools, Eugene Reville, Superintendent of the Buffalo, New York public schools, will be heard. Mr. Reville has enjoyed great success with a magnet school program in Buffalo.

E. *The Seniority Issue*

The following policy on seniority shall apply to those teachers from PCSSD who will be employed to work in the LRSD beginning in the fall of 1987. After the second year of employment by LRSD, a staff member will obtain one-third of his/her seniority acquired in PCSSD, which will be added to the two years of employment in the LRSD. At the end of the fourth year of employment, another one-third of the seniority acquired in PCSSD will be obtained. At the end of the fifth year, the remaining years of seniority in PCSSD will be obtained. In summary, after five years of employment in LRSD, all the years of seniority in PCSSD will be added to the five years spent in LRSD and the sum of these two figures will represent that individual's seniority.

## VIII.

### THE CITIZENS COMMITTEE

The Court appointed the Citizens Committee to assist the Court, not to represent any party's interests. The Committee members were selected by the Court because of their combined expertise in matters concerning education, civil rights litigation and computers.

This Committee has performed valuable service for the Court. Its report on teacher reassignments has been made part of the record in this case. I have given all the parties an opportunity to respond to this report, and these responses will also be entered into the record along with this Order. The criticism of the Committee report appears to be without any substantial basis. I plan to utilize the Committee in an examination of the magnet school implementation and the student assignment plan. As indicated in the Court's Orders of April 15 and April 21, 1987 creating the Committee, this type of citizens committee has been utilized in many desegregation cases.

### EXHIBIT A

### PROPOSED AGREEMENT

### BETWEEN THE TEAMS REPRESENTING

### THE LITTLE ROCK SCHOOL BOARD

### AND

### THE LITTLE ROCK CLASSROOM TEACHERS ASSOCIATION

### POLICY FOR REASSIGNMENT (1987–88)

### DURING REORGANIZATION

I. GENERAL PHILOSOPHY

    A. INTRODUCTION. The LRCTA and the LRSD BoD join in a cooperative

effort to implement the reorganization directed by the U.S. District Court. The goals of this cooperative effort are to implement the desegregation plan directed by the court, minimize any adverse effects on the quality of the instructional program, and minimize disruption of teaching. These procedures are developed under the guidelines of, and address, the spirit and intent of the Little Rock School District Desegregation Plan (March, 1986), the present Professional Negotiations Agreement between the Board and the Association, and the Arkansas Education Standards. Volunteerism, to the extent it serves desegregation requirements and the goals of this effort, shall be encouraged and nurtured in this process. Every teacher involved in reorganization shall be given the maximum opportunity to determine in which school he/she desires to teach. Every effort will be made to keep changes in extra duty assignments to a minimum.

BALANCE. The configurations resulting from reassignment shall reflect the balance in race, sex, age, education and experience that exists in the *group* of teachers in the present LRSD before reorganization. A six percent (6%) tolerance, above and below the group balance before reorganization, shall be acceptable in any school when necessary.

1. Training

For the purpose of reorganization, teachers shall be divided into two (2) groups according to training. One group shall consist of teachers on the teacher salary schedule presently below BA + 36 or MA, and the other group shall consist of those at or above BA + 36 or MA. (BA, BA + 12, BA + 24) (BA + 36 or MA, MA + 15, MA + 30)

2. Experience

For the purpose of reorganization, teachers shall be divided into three (3) groups according to experience credited on the teacher salary schedule. The first group would consist of those with one (1) to four (4) years experience; the second group would consist of those with five (5) to eleven (11) years experience, and the third group would consist of those with twelve or more years experience.

3. Race

For the purpose of reorganization, teachers shall be divided into two (2) groups according to race. One group will consist of black and the other group non-black.

4. Sex

For the purpose of reorganization, teachers shall be divided into two (2) groups according to their sex.

5. Age

For the purpose of reorganization, teachers shall be divided into three (3) groups according to age. The three (3) groups are:

a. 30 and under

b. 31 to 50

c. 50 and over

C. INTERDISTRICT STAFF. The interdistrict aspect of the court remedy will be reflected by including in the teaching staff of each school all those teachers who were not employed by the district in the 1986–87 school year. The number of these former PCSSD teachers will equal between 10% and 30% of the staff at each school.

D. SECONDARY COUNSELORS. At least one counselor in each secondary school in the annexed area will be assigned from the present LRSD. This requirement is necessitated by the need for procedural consistency on promotion, graduation, etc.

II. UNRELATED TRANSFERS. No voluntary or involuntary transfers unrelated to reorganization shall take place before reorganization reassignment is complete.

III. AFFECTED SCHOOLS. With the exception of the Metropolitan Area Vocational-Technical Center, all schools within the reorganized district, includ-

ing the schools in the area to be annexed, are to be affected by reorganization.

IV. DEFINITIONS: For the purpose of this reassignment process, the following definitions shall be used:

—GROUP or GROUPS OF TEACHERS—Present LRSD teachers who are on full-time assignment at a school or are assigned a school as a "home" school. Employees of the PCSSD who are on full-time assignment at the schools to be annexed and who are employed by LRSD shall become part of the group at the time their particular school goes through this process for reorganization.

—CORE STAFF—The teaching staff who will remain at the school to which they are presently assigned. The core staff will not exceed 20 percent of the teaching positions in any school and will be required to meet the balance criteria as with all assignments.

—REASSIGNMENT GROUP—Teachers who are not selected to remain as core staff in their presently assigned buildings.

—VOLUNTARY TRANSFER—Any assignment awarded a teacher that reflects the first, second, or third choice of that teacher for reassignment.

—INVOLUNTARY TRANSFER—Any assignment awarded a teacher that does not reflect the first, second, or third choice for reassignment of that teacher.

—SENIORITY—Shall be defined as a teacher's total number of years of employment by the Little Rock School District, with those teachers having the greatest length of service having the most seniority.

—CERTIFICATION AREAS—Shall be defined as those grade levels or subject or subject discipline that the State of Arkansas provides a license to teach.

—REASSIGNMENT—Shall mean an assignment that results in a change in the building assignment but does not result in a change in grade level and/or subject matter.

—OPEN POSITION(S)—Shall be defined as 1) All positions in all schools and in all grade levels in the Little Rock School District. 2) Any new position created by reorganizing and/or reassignment. 3) Any position from which a teacher has resigned and/or retired. These positions shall be designated by subject matter and grade.

V. SPECIFIC PROCEDURES.

A. Principals shall be identified and assigned first, and these assignments shall be provided to the teachers. In addition, the specialties to be identified with the elementary schools shall be provided to the elementary teachers, and magnet school identities shall be provided to teachers serving in the grade levels affected by the magnets.

B. All teachers shall be given the option to remain in the building and select the grade they wish to teach. Teachers presently assigned to K–6 or 1–6 may voluntarily choose any grade within their area of certification. Said teachers may only be involuntarily transferred up one (1) grade level or down one (1) grade level within their area of certification.

Junior High teachers and Senior High teachers shall be given the option to remain in the building and select the grade they wish to teach; provided, however, that the grade they select falls within their area of certification. Said teachers may only be involuntarily transferred up one grade or down one grade level within their area of certification.

It is understood and agreed that, since student assignments will not be made until after most teacher assignments are complete, grade assignments are tentative until students are assigned and master schedules completed. *In any case, no 1986-87 LRSD teacher who is eligible for reelection will be laid off as a result of this reorganization.* The Board agrees to restrict grade assignments to the necessary minimum and to make all such changes

in accordance with the Professional Negotiations Agreement. *In addition, because of the potential effects of the Controlled Choice student assignment plan, approximately 120 teaching positions will be left vacant or unassigned until student assignments are finalized.*

C. An optimum staffing pattern will be established for each school by determining the percentage distribution of "balance" factors in the present *group* of LRSD teachers and applying those percentages to teaching positions available at each individual school.

D. All teachers will fill out a form listing years experience in Little Rock; and years of experience outside Little Rock and seniority in the Little Rock School District; present grade level and/or subject matter assignment; race; sex; age; training (to include specialty training); extra duties for which pay is received; and a priority listing of at least three (3) separate schools to which they wish to be assigned. Teachers should list only those schools to which they wish to be assigned. These requests shall supersede any requests for transfer filed prior to this request. Each teacher shall have five (5) school days after receipt to return the form. The Personnel Department shall provide each school a list of teachers showing date of hire and training as reflected by the salary schedule.

E. Each school will be dealt with individually *to the extent that the core staff in each school will be assigned first.*

F. Since there are more teachers presently assigned to each building than there will be acceptable "balance" assignments after reorganization, seniority in the LRSD shall be the determining factor in assigning teachers to remain in the building. Until the "core staff" is reached in those schools to be annexed, seniority with the PCSSD shall be the determining factor in assigning those former employees of the PCSSD who have been hired by the LRSD.

G. Teachers who do not wish to remain in the building or are unable to remain in the building as a result of reorganization shall be placed in the Reassignment Group. Teachers in the Reassignment Group shall be placed in order of seniority with the one with the most seniority being placed first.

H. Schools that are presently in the LRSD shall be assigned first. After the Core Staff is assigned in each of those schools, teachers in the Reassignment Group at that time shall be reassigned to the maximum extent that does not violate balance and interdistrict staff requirements.

I. Schools that are presently in the PCSSD shall be assigned next. After the Core Staff is assigned in each of the schools to be annexed, the remaining former PCSSD teachers will be placed in the the the Reassignment Group, and voluntary transfers will be awarded from the entire Reassignment Group in accordance with the balance and interdistrict staff requirements.

J. Finally, the teachers remaining in the Reassignment Group will be transferred involuntarily in accordance with the requirements herein. (Refer back to V, B.)

K. Teachers who are assigned as an involuntary transfer (see definition) will accrue the rights and responsibilities set forth in the appropriate article of the PN Agreement.

VI. MAGNET SCHOOLS. Magnet schools shall be the first schools in which reassignments are determined under the procedures identified in V., A., through V., H. above.

VII. REASSIGNMENT APPEALS.

A. Teachers who allege that their reassignment was not done in accordance with this agreement on reorganization assignments, may appeal their assignment at a hearing of the Reassignment Committee that will consist of three (3) representatives of the Little Rock Classroom Teachers Association, and

three (3) administrators. The Committee shall make recommendations to the Superintendent for resolution of the disputed assignments. If the appeal does not resolve the dispute, he/she shall have the right to appeal to a hearing of the Board. All appeals must be made within five (5) school days of the announcement of reassignment or decision. The hearings of the Reassignment Committee or Board shall be held within five (5) school days of the appeal of that party. The decisions of the Superintendent and the Board must be made within three (3) school days of completion of the hearings. This agreement, rather than the Professional Negotiations Agreement governs in all appeals from reorganization reassignments and transfers except as provided herein for the 1987–88 school year. At such time as all the appeals from the reorganization assignments are settled, requests for transfer and reassignment will revert to the policies established by the existing Professional Negotiations Agreement.

IX.* MISCELLANEOUS

A. In order to facilitate this procedure, a running record of the teachers falling into each category will be maintained along with a list of the positions as they are filled.

B. Any physically handicapped teacher whose mobility is affected will not be reassigned except by the teacher's choice.

C. Every effort will be made to keep changes in extra duty assignments to a minimum. Teachers who are reassigned shall have an opportunity to request and be fairly considered for an extra duty assignment similar to the one held during the 1986–87 school year.

X. The Board and Association shall make every effort to implement and complete these procedures before April 30, 1987.

Sequence for Establishing Balance

* Ed. Note There is No VIII.

1. Little Rock School District publishes open positions.

2. A determination is made as to the percentage of teachers falling into each reassignment classification with regards to training, experience, race and sex in each type of school.

3. The percentage shall be applied to each school and an optimum faculty computed.

4. All teachers undergoing reassignment shall fill out a form listing years experience in Little Rock School District, present grade level-subject matter area, race, sex, training, extra duties for which pay is received, choice of schools to which they wish to be assigned; and requests for transfer to open grade level-subject matter area.

5. A determination is made whether there are sufficient teachers in a grade level subject matter field to fill all open positions. If not a request for transfer will be honored and so noted on the application.

6. All teachers being assigned to a type of school will have their applications arranged in order of length of service in the Little Rock School District.

Each teacher will be assigned, one at a time, to his/her highest choice possible which does not cause an optimum to be exceeded in any category. If no choices are possible the application shall be set aside and acted upon in order of seniority after all other applications have been considered. At that time, assignment will be made so that no class will exceed the optimum percentage by more than six (6) percent. In order to facilitate this procedure, a running record of the teachers falling into each category will be maintained along with a listing of the positions as they are filled.